# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA,

v.

LEONARD MAURICE LEWIS,

Defendant.

No. 4:17-CR-0242

(Judge Brann)

## MEMORANDUM OPINION

### JUNE 12, 2018

Defendant Leonard Maurice Lewis, hereinafter "Lewis," filed a motion to suppress an interview conducted by a United Postal Service Investigator. Although Lewis was read his *Miranda* rights, and waived those rights both orally and in writing prior to the commencement of the interview, the investigator did not advise Lewis until the close of the interview that he had been indicted two days prior and that the investigator possessed an arrest warrant and would be transporting him to his arraignment. The issue presented here is whether, prior to making incriminatory statements during the interview, the right to counsel had attached, and if it did, whether Lewis knowingly and intelligently waived that right. I hold today that the answer to both questions is affirmative.

# I.    BACKGROUND

On August 9, 2017, Lewis was charged in a five count indictment[1] of various crimes of sexual exploitation of minors.[2] Two days later, on August 11, 2017, United States Postal Service Investigator Michael Corricelli, hereinafter "Corricelli" travelled to Lewis's apartment in New York, New York, armed with an arrest warrant. He proceeded to interview Lewis about those crimes.[3] Corricelli did not advise Lewis at the outset of the interview that Lewis had been indicted nor that Corricelli possessed an arrest warrant. It was only when Corricelli concluded the interview that he informed Lewis of these two facts.

Corricelli testified[4] that he has been a postal investigator for twenty-four years. He explained he spent most of his career investigating crimes against children. To maintain and improve his skills, Corricelli took annual training classes, often week long courses in both basic and advanced skills of interrogation. Corricelli is also an instructor at training courses for new employees. Corricelli

---

[1] ECF No. 1.

[2] Subsequently, the Government filed a superseding indictment. April 11, 2018, ECF No. 53. Lewis is charged with Count I: Distribution of Marijuana. Count II: Attempted Sexual Exploitation of a Child. Counts III and IV: Attempted Coercion and Enticement of Minor to Engage in Sexual Activity. Count V: Production and Distribution of Obscene Visual Representation of the Sexual Abuse of Children.

[3] Corricelli did not arrive alone. He was accompanied by three other law enforcement officers. Two investigators remained in the hallway of Lewis's apartment building during the interview, and the third accompanied Corricelli into the apartment and witnessed the interview.

[4] During a May 31, 2018 suppression hearing conducted before the Court. I also note, for the record, that I found Corricelli to be a credible witness.

has previously been qualified in this District as an expert on child exploitation cases, although for the purposes of the instant motion, he was testifying as a lay witnesses as the lead investigator in this matter. Corricelli testified that he has worked as the lead investigator on somewhere between one-hundred thirty and one-hundred forty undercover operations.

The United States Postal Service had investigatory jurisdiction over this matter because the juvenile's mother had discovered a package Lewis sent to the boy that contained both nude male models and a brownie with marijuana in it, among other items. The juvenile is the son of Lewis's cousin, and Corricelli testified that Lewis "spent a significant amount of time over the years with their family."

At some point in time after the investigation began, Corricelli began exchanging multiple text message exchanges with Lewis while posing as Lewis's minor relation. Lewis returned text messages to Corricelli posing as the minor. These text messages included links to sexually graphic activity and 'photo shopped' pictures where Lewis had superimposed his face and the face of the minor over the faces of the men in the pictures engaging in sexually graphic activity. Lewis also sent text messages to the minor suggesting that the minor travel to New York City to visit Lewis (the minor had done so previously) and

further proposed that he would 'train' the minor by inserting objects into his rectum.

When Corricelli arrived at Lewis's apartment, he was wearing plain clothes, as opposed to a suit or law enforcement uniform.  He revealed that he wore a sweater vest because he was wearing body armor underneath his clothes.  He also wore his postal inspector badge in a manner visible to Lewis.  No testimony was elicited as to how the other three investigators were dressed.

Corricelli began the interview by asking Lewis if he could record the interview, then spent approximately five minutes *'Mirandizing'* Lewis, both orally and in writing.  Lewis signed a consent form, copied herein in its entirety.



**GOVERNMENT EXHIBIT**

**3**



U.S. Postal Inspection Service
**WARNING AND WAIVER OF RIGHTS**

Place: 382 Central Park West #3U
NY, NY

Date: 8·11·2017   Time: 0808

## WARNING

BEFORE YOU ARE ASKED ANY QUESTIONS, YOU MUST UNDERSTAND YOUR RIGHTS.

- You have a right to remain silent.
- Anything you say can be used against you in court.
- You have the right to talk to a lawyer for advice before we ask you any questions and to have him with you during questioning.
- If you cannot afford a lawyer, one will be appointed for you before any questioning if you wish.
- If you decide to answer questions now without a lawyer present, you will still have the right to stop answering questions at any time. You have the right to stop answering questions at any time until you talk to a lawyer.

I have read this statement of my rights (This statement of my rights has been read to me) and I understand what my rights are.

8/11 (Date)        8:13 (Time)        _____ (Signature)

## WAIVER

I am willing to discuss subjects presented and answer questions. I do not want a lawyer at this time. I understand and know what I am doing. No promises or threats have been made to me and no pressure or coercion of any kind has been used against me.

8/11 (Date)        8:14 (Time)        _____ (Signature)

Witnessed by: _____ #5423

Title: U.S. Postal Inspector

Witnessed by: Edward Sfa  6274

Title: 8:14 am

IS Form 1067 November 2002 (20250-3117)

During a May 31, 2018 hearing[5], Corricelli was asked, on cross-examination, if he and the other investigators had discussed not advising Lewis of the arrest warrant and pending indictment at the outset of the interview. Corricelli replied that they had not, explaining "that issue has never been a topic of discussion in my career."

Corricelli testified that he found Lewis to be "intelligent and lucid" during the interview. However, Corricelli believed that Lewis was "calculating" in some of his answers, and he knew that Lewis was not being completely forthcoming.

Corricelli attested that he specifically chose to travel to arrest Lewis in order to interview Lewis. He explained that because an arrest warrant had issued, he could have asked a colleague in New York City to arrest Lewis and transport Lewis to the initial appearance and arraignment in Harrisburg, Pennsylvania. However, Corricelli chose to travel to arrest Lewis himself because wanted to corroborate the story the minor had relayed to him with Lewis's story. He had previously interviewed the minor and his brother.

Corricelli testified that in his years of experience, minor victims, especially male minor victims, tend to leave out parts of the story. In Corricelli's view, this

---

[5] "Although Rule 12 does not by its terms specify when such a motion entitles a defendant to a pretrial evidentiary hearing, we have held that a defendant's moving papers must demonstrate a 'colorable claim' for relief." *United States v. Voigt*, 89 F.3d 1050, 1067 (3d Cir. 1996).

was not an attempt to elicit a confession, but rather a "fact-finding" mission, intended to validate the tale told by the juvenile with Lewis's account.

The interrogation/interview[6] lasted approximately forty-five minutes, during which time Lewis made multiple incriminating statements. At the conclusion of the questioning, Corricelli explained to Lewis that he had an arrest warrant and would be immediately driving Lewis to Harrisburg, Pennsylvania for an initial appearance, arraignment, and plea hearing.

Additionally, Corricelli requested permission to search Lewis's cellular phone. Lewis initially consented, but as Corricelli began explaining the consent in detail to Lewis using a similar consent form to the *Miranda* form, Lewis withdrew his consent to the search. Corricelli promptly halted the search and pressed the issue no further.

During the hearing, the Assistant United States Attorney asked Corricelli if Lewis had asked for an attorney at any point during the interview. Corricelli replied that Lewis never did, and had Lewis requested counsel, Corricelli "would have terminated the interview. Once an individual requests an attorney, the investigation has got to stop."

---

[6]   Defense counsel characterizes the questioning as an 'interrogation.' Corricelli characterizes it as an 'interview.'

Following his arrest and arraignment, Lewis filed a motion to suppress[7] the interview[8] asserting that his Sixth Amendment right to counsel had attached once he was indicted. He asserts that the statements were obtained after that right had attached, and that the statements were not knowingly, willingly, or voluntarily made because Corricelli did not advise Lewis at the commencement of the interview that Lewis had been indicted or that the investigator possessed an arrest warrant and would be arresting Lewis at the conclusion of the interview. Although Corricelli advised Lewis of his *Miranda*[9] rights and Lewis signed a corresponding written consent form agreeing to the voluntariness of the interview, Corricelli did not notify Lewis at the outset that he possessed an arrest warrant or that a grand jury in the Middle District of Pennsylvania had indicted Lewis.

Because there is no case law in this Circuit that supports Lewis's proposition that law enforcement must advise a defendant of pending indictments/arrest warrants, I hold today that Lewis's waiver was knowing and intelligent. For the reasons that follow, the motion to suppress is denied.

---

[7] March 23, 2018, ECF No. 47.

[8] A second recorded interview also occurred in the vehicle on the drive to Harrisburg. Counsel is moving to suppress the second interview, if the first is suppressed, as 'fruit of the poisonous tree.' Both recorded interviews were provided to the Court by the Government on a compact disc, and the Court has listened to both recordings in their entirety.

[9] *Miranda v. Arizona*, 384 U.S. 436 (1966).

## II.    DISCUSSION

The pivotal case on the Fifth Amendment right against self-incrimination in custodial interrogation, *Miranda v. Arizona, supra,* is a useful guide to frame this issue generally, before turning to Lewis's argument that the Sixth Amendment right to counsel was violated here.  In *Miranda*, the United States Supreme Court "deal[t] with the admissibility of statements obtained from an individual who [wa]s subjected to custodial police interrogation and the necessity for procedures which assure that the individual is accorded his privilege under the Fifth Amendment to the Constitution not to be compelled to incriminate himself."[10] *Miranda* was concerned with "the manner in which the constitutional rights of the individual could be enforced against overzealous police practices."[11]  The *Miranda* Court began by citing to the historical underpinnings of the constitutional right.

> The maxim 'Nemo tenetur seipsum accusare,' had its origin in a protest against the inquisitorial and manifestly unjust methods of interrogating accused persons, which have long obtained in the continental system, and, until the expulsion of the Stuarts from the British throne in 1688, and the erection of additional barriers for the protection of the people against the exercise of arbitrary power, were not uncommon even in England. While the admissions or confessions of the prisoner, when voluntarily and freely made, have always ranked high in the scale of incriminating evidence, if an accused person be asked to explain his apparent connection with a crime under investigation, the ease with which the questions put to him may assume an inquisitorial character, the temptation to press the witness

---

[10]    *Miranda*, 384 U.S. at 439.

[11]    *Id.* at 444.

unduly, to browbeat him if he be timid or reluctant, to push him into a corner, and to entrap him into fatal contradictions, which is so painfully evident in many of the earlier state trials, notably in those of Sir Nicholas Throckmorton, and Udal, the Puritan minister, made the system so odious as to give rise to a demand for its total abolition. The change in the English criminal procedure in that particular seems to be founded upon no statute and no judicial opinion, but upon a general and silent acquiescence of the courts in a popular demand. But, however adopted, it has become firmly embedded in English, as well as in American jurisprudence. So deeply did the iniquities of the ancient system impress themselves upon the minds of the American colonists that the States, with one accord, made a denial of the right to question an accused person a part of their fundamental law, so that a maxim, which in England was a mere rule of evidence, became clothed in this country with the impregnability of a constitutional enactment.[12]

Then, by way of introduction to the lengthy explanation that follows, the Supreme Court wrote a useful shorthand explanation of its holding as follows:

[B]riefly stated [the holding] is this: the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination. By custodial interrogation, we mean questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way. As for the procedural safeguards to be employed, unless other fully effective means are devised to inform accused persons of their right of silence and to assure a continuous opportunity to exercise it, the following measures are required. Prior to any questioning, the person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed. The defendant may waive effectuation of these rights, provided the waiver is made voluntarily, knowingly and

---

[12] *Brown v. Walker*, 161 U.S. 591, 596—597 (1896).

intelligently. If, however, he indicates in any manner and at any stage of the process that he wishes to consult with an attorney before speaking there can be no questioning. Likewise, if the individual is alone and indicates in any manner that he does not wish to be interrogated, the police may not question him. The mere fact that he may have answered some questions or volunteered some statements on his own does not deprive him of the right to refrain from answering any further inquiries until he has consulted with an attorney and thereafter consents to be questioned.[13]

In responding to the Defendant's motion, the Government has the burden of proving that the right to counsel had not attached, and if it had, that Lewis had 'knowingly and intelligently' given up his right to counsel during that interview.  I find that the Government has met its burden here.

The Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right to …have the assistance of counsel for his defense." "[A] defendant, charged with a serious crime, must not be stripped of his right to have sufficient time to advise with counsel and prepare his defense."[14]  The "right to counsel granted by the Sixth and Fourteenth Amendments means at least that a person is entitled to the help of a lawyer at or after the time that judicial proceedings have been initiated against him 'whether by way of formal charge, preliminary hearing, indictment, information, or arraignment.'"[15]

---

[13]  *Miranda* at 444-45.

[14]  *Powell v. State of Ala.*, 287 U.S. 45, 59 (1932).

[15]  *Brewer v. Williams*, 430 U.S. 387 (1977).

Here, the record is clear that Lewis's right to counsel had attached prior to his being interviewed.  Lewis was indicted on August 9, 2017 and an arrest warrant was issued the same day.  The postal investigators travelled to Lewis's residence on August 11, 2017, armed with that arrest warrant, and proceeded to question him.   It is clear, therefore, that Lewis's right to counsel had attached prior to the interrogation.

The compelling case cited by Defendant, *United States v. Brown*,[16] a decision of the United States Court of Appeals for the Second Circuit, held that a postindictment statement taken from defendant violated his Sixth Amendment right to counsel and could not be used for impeachment of the Defendant at trial.  In a two-defendant case, a prior statement of Defendant Brown was used at trial to impeach Brown.[17]   "On cross-examination Brown was questioned about a statement he had given to FBI Agent Shea … approximately one hour before his arraignment, following his indictment a month earlier."[18]  "Agent Shea testified that [] he had advised Brown orally of his Miranda rights."[19]  "At the time when he took the statement Shea was aware that Brown would be arraigned within the hour,

---

[16]   699 F.2d 585 (2d Cir. 1983).

[17]   *Id.* at 587-88.

[18]   *Id.* at 587.

[19]   *Id.*

at which time counsel would be appointed to represent him."[20] "Although Shea was aware that Brown would have counsel appointed for him within the hour upon arraignment, Shea conceded that he did nothing to explain to Brown the significance of his legal situation, or that he would shortly have the advice and representation of a lawyer."[21]

The Second Circuit held that a post-indictment, uncounseled confession must have been voluntarily given after a valid waiver of the right to counsel. "Since Brown had been indicted prior to his interview with Agent Shea, his right to counsel had attached."[22] "Indictment marks the crucial point after which the purpose of the police in interrogating the defendant is not merely to investigate but to establish the guilt of the accused."[23]

*Brown* stood[24] for the proposition that "the Sixth Amendment requires that the accused have the assistance of counsel or that the government meet the 'heavy burden of proving that any inculpatory statements thus obtained were voluntarily given after a valid waiver of the right to counsel.'"[25] "That 'heavy burden' requires at a minimum some additional indication that the appellant understood what he

---

[20]  *Id.* at 588.

[21]  *Id.*

[22]  *Id.*

[23]  *Id.* at 589 (internal quotation and citation omitted).

[24]  I use the past tense because, as discussed *infra, Brown* is no longer good law in the Second Circuit.

[25]  *Id.* (internal citation omitted).

was surrendering."[26]  "Warnings pursuant to *Miranda v. Arizona* do not suffice to meet the higher standard with respect to waiver of the right to counsel that applies when the Sixth Amendment has attached."[27]  This is because "a waiver of his Sixth Amendment right to counsel [] must be measured by a 'higher standard' than [] waivers of Fifth Amendment rights."[28]

The *Brown* court concluded that "the sequence of events in this case—the indictment of Brown filed a month before the interrogation, his arrest and incarceration thereafter, and the prospective arraignment and assignment of counsel within an hour of his interrogation—leaves no doubt that Shea did not have an investigative purpose in arranging this pre-arraignment 'detour' of Brown for interrogation in the basement of the U.S. Marshal's office, but was seeking to elicit an uncounseled confession, a practice we have repeatedly disapproved."[29]

The Second Circuit has retreated from the *Brown* holding, now thirty-six (36) years old.  In the matter of *United States v. Charria*,[30] Judge John M. Walker held that an indicted defendant was given *Miranda* warnings but not informed of an indictment against him could effectively waive his right to counsel.  Although

---

[26]  *Id.*

[27]  *Id.*

[28]  *Id.* at 590.

[29]  *Id.* at 589.

[30]  919 F.2d 842 (2nd Cir. 1990) *abrogated on other grounds by U.S. v. Castano,* 999 F.2d 615 (2nd Cir. 1993).

*Charria* did not explicitly overrule *Brown*, it did overrule the cases upon which *Brown* relied.

Charria addresses a similar argument made by Lewis. Charria knew he was under arrest at the time of questioning; however, he did not know that he had previously been indicted. "[Charria] asserts only that in order for an indicted defendant to effectively waive the right to counsel he must, in addition to being advised of his Miranda rights, be informed by an arresting officer of the indictment pending against him."[31] "The sole issue before us, therefore, is whether an indicted defendant who has been given the *Miranda* warnings but not informed of the indictment against him may waive the right to counsel when consenting to custodial questioning and a search of his home."[32]

In holding that the wavier is effective despite the Defendant's lack of notice as to his pending indictment, Judge Walker in *Charria* wrote, "Even at a critical stage, however, the sixth amendment right to counsel can be knowingly and voluntarily waived by a criminal defendant who has been made fully aware of the nature of the right being abandoned and the consequences of abandonment."[33] "As to [] the two sixth amendment waiver[] effected by Charria—his waiver of the

---

[31] *Id.* at 846.

[32] *Id.*

[33] *United States v. Charria*, 919 F.2d 842, 846 (2d Cir. 1990), *see also Patterson v. Illinois*, 487 U.S. 285, 292–97 (1988); *see also Moran v. Burbine*, 475 U.S. 412, 421 (1986); *Johnson v. Zerbst*, 304 U.S. 458, 464 (1938).

right to counsel during consent to questioning []—we face a two-stage inquiry: was the waiver given at a critical stage where the right to counsel attached and, if so, could Charria have effectively waived the right to counsel after being apprised of his *Miranda* rights without being informed of the indictment pending against him?"[34] "There can be no doubt that Charria had the right to have the assistance of counsel when he consented to postindictment questioning by law enforcement authorities."[35] "*Patterson's*[36] pragmatic approach supersedes previous rulings of this circuit which, based on the concept of a hierarchy of constitutional rights, called for a higher 'knowing and intelligent' standard for sixth amendment waivers than for other waivers."[37] "We had established that, in order to effectively waive the right to counsel during postindictment questioning, an accused had to be informed of his indictment—including the significance thereof—by a neutral judicial officer."[38] "*Patterson* held that *Miranda* warnings sufficed for a "knowing and intelligent" waiver of the sixth amendment right to counsel during postindictment questioning, and consequently rejected the contention, citing [prior

---

[34]  *Id.* at 846.

[35]  *Id.*

[36]  *See infra.*

[37]  *Id.*

[38]  *Id.* at 847.

Second Circuit decisions], that the sixth amendment right to counsel is 'superior' to or 'more difficult' to waive than its fifth amendment counterpart."[39]

In that vein, the Government relies on three cases to demonstrate that an investigator need not inform a post-indictee of his or her indictment prior to obtaining a waiver of counsel: *Patterson v. Illinois*,[40] *Riddick v. Edmiston*,[41] and *United States v. Augusta*.[42]

In *Patterson v. Illinois*, the police twice informed Patterson that he had been indicted for murder, yet he still signed a *Miranda* form waiving his right to counsel and provided inculpatory statements to authorities which were admissible at trial. The facts of *Patterson* are as follows.

> Police Officer Michael Gresham, who had questioned petitioner earlier, removed him from the lockup where he was being held, and told petitioner that because he had been indicted he was being transferred to the Cook County jail. Petitioner asked Gresham which of the gang members had been charged with Jackson's murder, and upon learning that one particular Vice Lord had been omitted from the indictments, asked: "[W]hy wasn't he indicted, he did everything." Petitioner also began to explain that there was a witness who would support his account of the crime.
>
> At this point, Gresham interrupted petitioner, and handed him a Miranda waiver form. The form contained five specific warnings, as suggested by this Court's Miranda decision, to make petitioner aware of his right to counsel and of the consequences of any statement he

---

[39]  *Id.*

[40]  487 U.S. 285, 290 (1988).

[41]  894 F.2d 586 (3d Cir. 1990).

[42]  No. 1:16-cr-00082, 2018 WL 317972 (M.D. Pa. Jan. 8, 2018) (Kane, J.) (non-precedential).

might make to police. Gresham read the warnings aloud, as petitioner read along with him. Petitioner initialed each of the five warnings, and signed the waiver form. Petitioner then gave a lengthy statement to police officers concerning the Jackson murder; petitioner's statement described in detail the role of each of the Vice Lords—including himself—in the murder of James Jackson.

Later that day, petitioner confessed involvement in the murder for a second time. This confession came in an interview with Assistant State's Attorney (ASA) George Smith. At the outset of the interview, Smith reviewed with petitioner the Miranda waiver he had previously signed, and petitioner confirmed that he had signed the waiver and understood his rights. Smith went through the waiver procedure once again: reading petitioner his rights, having petitioner initial each one, and sign a waiver form. In addition, Smith informed petitioner that he was a lawyer working with the police investigating the Jackson case. Petitioner then gave another inculpatory statement concerning the crime.[43]

Justice Byron White, writing for the majority in *Patterson* stated "There can be no doubt that petitioner had the right to have the assistance of counsel at his postindictment interviews with law enforcement authorities."[44] However, "if an accused 'knowingly and intelligently' [makes a statement without the benefit of counsel], we see no reason why the uncounseled statements he then makes must be excluded at his trial."[45] The Supreme Court was explicit in distinguishing pre-indictment investigations from post-indictment questioning, stating "the key inquiry in a case such as this one must be: Was the accused, who waived his Sixth

---

[43] *Patterson*, 487 U.S. at 288-89.

[44] *Id.* at 290.

[45] *Id.* at 291.

Amendment rights during post-indictment questioning, made sufficiently aware of his right to have counsel present during the questioning, and of the possible consequences of a decision to forgo the aid of counsel?"[46]

Similarly, in *Riddick v. Edmiston*,[47] the United States Court of Appeals for the Third Circuit explicitly rejected the Second Circuit's pre-*Patterson* line of cases. While not naming *Brown* specifically, *Riddick* rejected by name the cases *Brown* had relied upon. Similar to *Charria*, but distinguishable from the matter at hand, Defendant Riddick was not aware that he had been indicted, although he had been arrested at the time he made his inculpatory statements to investigators. The facts of *Riddick* are as follows.

> Riddick's convictions arose out of a dispute over money with a person named Dewey Badger (Badger). In June of 1984, Badger was shot and left lying in a vacant lot in Jersey City, New Jersey. Badger later died from the wounds caused by the shooting. Before he died, Badger identified the person who shot him by the names "James" and "Gump." Riddick's nickname is Gump.
>
> After Riddick had been arrested for killing Badger in Suffolk, Virginia, and had waived extradition, two New Jersey investigators were sent to Virginia to return him to New Jersey. In Virginia, upon first seeing Riddick, these investigators greeted him with the name "Gump." Riddick responded to this greeting and expressed confusion as to why he was arrested. The investigators then informed Riddick orally and in writing of his constitutional rights, in accordance with the requirements of *Miranda v. Arizona*, and proceeded to question him about the homicide charge. Riddick responded by raising a claim

---

[46]   *Id.* at 292–93.

[47]   894 F.2d 586 (3d Cir. 1990).

of alibi, claiming that he did not even know Badger and saying that the accusation of murder was unjust.[48]

Our Court of Appeals has clearly rejected the Second Circuit's initial *Brown* approach and has instead found that there is no heightened standard for giving *Miranda* warnings. Judge William D. Hutchinson, noted in *Riddick* that "this presents a question of first impression in this Circuit."[49] "After considering it, we are constrained to reject the reasoning of the cases in the Second Circuit and instead hold that the Miranda warnings the investigators gave Riddick were sufficient, on this record, to advise him of his Sixth Amendment post-indictment right to counsel."[50] "Accordingly, we hold that he knowingly and voluntarily waived that right when he made his custody statements to the investigators and that those statements were properly admissible at trial."[51]

Judge Hutchinson explained that the Second "circuit apparently does not base this additional safeguard on the Constitution itself, but instead imposes it in the exercise of its supervisory power, possibly to minimize disputes about whether the government has met its 'heavy burden' of showing an indicted defendant has waived his Sixth Amendment rights."[52]  "Considering that heavy burden, it holds

---

[48]  *Id.* at 588–89.

[49]  *Id.*  at 588.

[50]  *Id.*

[51]  *Id.*

[52]  *Id.* at 590.

that there is no valid Sixth Amendment waiver unless a 'higher standard' than that

required by the Fifth Amendment is satisfied, and therefore, police administration

of the Miranda warnings are insufficient to effectuate that waiver."[53]  "The United

States Supreme Court in *Patterson v. Illinois*, held that the Fifth Amendment

Miranda warnings are sufficient to make a defendant aware of his Sixth

Amendment right to counsel in the context of post-indictment questioning."[54]

"The Court drew no analytical distinction between Fifth Amendment and Sixth

Amendment rights in Patterson."[55]

> The *Riddick* Corut, in interpreting *Patterson* stated,

> The rationale for the Supreme Court's holding in *Patterson* that *Miranda* warnings are sufficient to waive counsel for post-indictment questioning has several prongs. In the first place, the Court pointed out that *Miranda* warnings make it clear that an accused has a right to consult with an attorney, to have one present during questioning and, if necessary, to have one appointed at state expense. They "conveyed to [the accused] the sum and substance of the rights that the Sixth Amendment provided him." Second, *Miranda* warnings inform an accused of the consequences of a decision to speak to law enforcement officials without counsel; namely, that any statement he makes can be used against him in later criminal proceedings.  Finally, *Miranda* warnings let the accused know what an attorney can do during post-indictment questioning; namely, advise him to speak or remain silent.[56]

---

[53]  *Id.*

[54]  *Id.*

[55]  *Id.*

[56]  *Id.* at 591.

Finally, in *United States v. Augusta*,[57] the Honorable Yvette Kane, of this Court, denied the suppression motions of two defendants in a fifteen-defendant criminal case regarding charges of production of child pornography.[58] In April 2016, agents served search warrants on two defendants - one located in Kentucky, the other in New York, New York.[59] The defendant in Kentucky was not notified of the pending indictment against him, but was shown a copy of the search warrant and arrest warrant. He was *Mirandized*, and signed the Department of Homeland Security's waiver form. The New York defendant was told by agents that they possessed a search warrant and they *Mirandized* him and had him sign a waiver form. They did not tell the defendant that he was a suspect in the investigation. Judge Kane denied both suppression motions, stating:

> Finally, Defendant Staples' argument that he could not fully appreciate and thus voluntarily waive the rights of which he was advised due to interviewing agents' failure to advise him at the outset of the interrogation of the pending indictment is likewise untenable. Notably, Defendant Staples cites no authority to support his position that the law requires an interviewing agent to advise a defendant of the existence of the indictment in order to adequately apprise a defendant of his Miranda rights and obtain a valid waiver. To that end, the Court is hard pressed to discern how advising Defendant Staples of the existence of an indictment against John Doe-7 would be material to, or have any bearing on, a finding that Defendant Staples voluntarily executed a valid Miranda waiver.

---

[57] No. 1:16-cr-00082-YK, 2018 WL 317972 (M.D. Pa. January 8, 2018) (Kane, J.).

[58] *Id.* at *1.

[59] *Id.* at *2.

*****

Even accepting Defendant Staples' position that the indictment triggered the attachment of his right to counsel under the Sixth Amendment, the Court nevertheless finds that the April 20, 2016 post-indictment interrogation did not violate Defendant Staples' Sixth Amendment right to counsel. As the Government correctly argues, Defendant Staples' reliance on *Carvey v. Le Fevre*, 611 F.2d 19 (2d Cir. 1979) , for the proposition that law enforcement agents are constitutionally required to expressly apprise a defendant of the indictment before a post-indictment Sixth Amendment waiver will be considered valid, is misplaced. (*Id.* at 73.) *Carvey* was abrogated by the United States Court of Appeals for the Second Circuit's decision in *United States v. Charria*, 919 F.2d 842, 848 (2d Cir. 1990), which held that "giving an indicted defendant Miranda warnings is sufficient to make 'knowing and intelligent' his waiver of the [S]ixth [A]mendment right to counsel, even if the defendant has not been expressly informed of the indictment pending against him." *United States v. Charria*, 919 F.2d 842, 848 (2d Cir. 1990). [60]

After reviewing the form signed by Lewis and listening to the postal investigator's verbal explanation of Lewis's rights, I find that although Lewis's Sixth Amendment right to counsel had attached, he knowingly and intelligently waived that right. "By knowing what could be done with any statements he might make, and therefore, what benefit could be obtained by having the aid of counsel while making such statements, petitioner was essentially informed of the possible consequences of going without counsel during questioning."[61] "If petitioner nonetheless lacked 'a full and complete appreciation of all of the consequences

---

[60]   *Id.* at *6.

[61]   *Patterson* at 295.

flowing' from his waiver, it does not defeat the State's showing that the information it provided to him satisfied the constitutional minimum."[62]

As Justice White explained in *Patterson*, "petitioner, however, at no time sought to exercise his right to have counsel present."[63] "[T]he key inquiry in a case such as this one must be: Was the accused, who waived his Sixth Amendment rights during postindictment questioning, made sufficiently aware of his right to have counsel present during the questioning, and the possible consequences of a decision to forgo the aid of counsel?" In the case at bar, I find that Lewis was made sufficiently aware of his right to counsel, despite no knowledge of his impending arrest and indictment. Moreover, this was a non-custodial interview, as it was held in Lewis's own apartment. The postal inspector carefully took several minutes to explain Lewis's rights to him.

It would appear that Lewis is arguing that once an arrest warrant has been issued or an indictment returned, there exists a sort of 'super-duty' over and above the standard *Miranda* process, in which a law enforcement officer must notify the Defendant of his impending arrest and indictment prior to obtaining his waiver of his right to counsel. Lewis's argument follows the *Brown* line of reasoning, which

---

[62] *Id.*

[63] *Id.* at 290.

is precisely the argument that the Second Circuit subsequently rejected in *Charria* and the Third Circuit spurned in *Riddick.*

*Patterson* cautions District Courts to be "pragmatic"[64] in analyzing whether a Defendant has validly waived his Sixth Amendment right to counsel at 'critical stages' of criminal proceedings. *Patterson* explicitly rejected the 'super-duty' the *Brown* line of cases had imposed[65] and held that the Sixth Amendment right to counsel is no 'more difficult," nor "superior" to waive than the Fifth Amendment right against self-incrimination.[66]  In fact, in rejecting the *Brown* line of case law, the Second Circuit in *Charria* explicitly rejected the argument Lewis makes here, stating:

> Charria urges that even after Patterson arresting officers must advise defendants of any pending indictments before soliciting sixth amendment waivers.
>
> Accepting that Charria was not informed of the indictment against him, *see supra* n. 1, we believe that his argument would make a patchwork of the law in this area—retaining procedures premised on the need to effect a supposed "distinction between Fifth and Sixth Amendment rights," *Mohabir*, 624 F.2d at 1147, after the Supreme Court has recognized that "there [is no] support ... for the notion that because a Sixth Amendment right may be involved, it is more difficult to waive than the Fifth Amendment counterpart." Patterson, 487 U.S. at 297–98, 108 S.Ct. at 2397–98. Patterson counsels a shift in sixth

---

[64]  *Id.* at 298.

[65]  *E.g. United States v. Mohabir,* 624 F.2d 1140, 1146–53 (2d Cir.1980)*; Carvey v. LeFevre, 611 F.2d 19, 21–22 (2d Cir.1979), cert. denied,* 446 U.S. 921, 100 S.Ct. 1858, 64 L.Ed.2d 276 (1980); *United States v. Satterfield, 558 F.2d 655, 657 (2d Cir.1976).*

[66]  *Patterson* at 292-300.

amendment waiver analysis away from the abstract importance of the right to counsel and toward a practical inquiry into:

> [W]hat purposes a lawyer can serve at the particular stage of the proceedings in question and what assistance he could provide to an accused at that stage [in order] to determine the scope of the Sixth Amendment right to counsel, and the type of warnings and procedures that should be required before a waiver of that right will be recognized.

> *Id.* at 298, 108 S.Ct. at 2398. Charria's argument would undermine this shift, and, further, is inconsistent with *Patterson's* conclusion that Miranda warnings suffice to effect a valid sixth amendment waiver during postindictment questioning. Once an accused understands that he is under arrest and, after receiving the Miranda warnings, understands his right to remain silent, the potential consequences of speaking, and his right to counsel, including during interrogation, he is fully apprised of the information needed to make a knowing waiver of the sixth amendment right; providing him with the information that he is also under indictment, the desirability of which is debatable, see Patterson, 487 U.S. at 295–96 n. 8, 108 S.Ct. at 2395–96 n. 8, is not constitutionally required.[67]

*Patterson*, *Charria*, and *Riddick* make clear that Postal Inspector Corricelli was not required to advise Lewis that he had been indicted.  It is unclear whether or not he was required to advise Lewis that he possessed an arrest warrant.  Be that as it may, I find in favor of the Government as to this question because, to hold otherwise, "would make a patchwork of the law in this area"[68] and appears contrary to the guidance provided in the post-*Brown* cases discussed above.

---

[67]  *Charria*, at 847–48.

[68] *Charria* at 847.

## III.   CONCLUSION

An appropriate Order follows.

BY THE COURT:


_s/ Matthew W. Brann_
Matthew W. Brann
United States District Judge